CLAASSEN MARRS, P.C.
John S. Claassen, Esq. (212954)
1261 Locust St., C26
Walnut Creek, CA 94596
Tel.: (925) 204-3885
Fax: (925) 204-3886

Attorney for Plaintiff
BIOQ PHARMA INCORPORATED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BIOQ PHARMA INCORPORATED,<br><br>Plaintiff,<br><br>vs.<br><br>STAR CAPITAL INVESTMENTS LLC, a/k/a STAR CAPITAL LLC & STAR CAPITAL; GS HOLDING & GURMEET SINGH BHAMRAH,<br><br>Defendants. | (i) COMPLAINT FOR BREACH OF CONTRACT, FAILURE TO NEGOTIATE IN GOOD FAITH, AND FALSE PROMISE; and<br><br>(ii) DEMAND FOR JURY TRIAL. |

**COMPLAINT & DEMAND FOR JURY TRIAL**

# COMPLAINT

Plaintiff BioQ Pharma, Incorporated ("Plaintiff") alleges as follows:

## I. PARTIES

1. Plaintiff is a corporation organized under the laws of the State of California with a principal place of business in San Francisco, California.

2. Defendant Star Capital Investments LLC is a business organization of form unknown to Plaintiff with a principal place of business at 604, 13th Building Bay Square, Business Bay, Dubai, UAE. On information and belief, the business organization is otherwise known as Star Capital LLC and Star Capital. It is referred to throughout this Complaint as "Star Capital".

3. Defendant GS Holding is a business organization of form unknown to Plaintiff. It shares the business address of Star Capital.

4. Plaintiff is informed and believes and, on that basis, alleges that Star Capital and GS Holding are investment companies constituting the "family office" of Gurmeet Singh Bhamrah ("Singh"; together all of the defendants are referred to as "Defendants"), a wealthy Indian national who on information and belief resides in Dubai and has been a resident of Dubai since 2019. Singh is not a resident of California. Singh holds himself out as a "true visionary" and "leading pioneer" in sectors ranging from sports, hospitality and healthcare to aviation and more. His and the other Defendants' motos are that "success is a journey not a destination . . ." and that "[m]ake friends, money follows[.]" On information and belief, Singh is the president of the other two Defendants; he signed documents alleged herein for said Defendants using this title. As alleged herein, on information and belief, during all times relevant to this action Singh controlled and continues to control the activities of both business entities. Using said investment companies, Singh asserts that Defendants invest in various enterprises around the world. On information and belief, Singh's personal address is District One, Mohammed Bin Rashid City, Villa 786, Dubai, UAE and, as president of the other two Defendants, he shares their business address.

**COMPLAINT & DEMAND FOR JURY TRIAL**
-1-

## II. SUBJECT MATTER JURISDICTION; PERSONAL JURISDICTION; AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. section 1332(a)(2) because the amount in controversy exceeds the jurisdictional minimum and this action is between a citizen of this state and citizens or subjects of a foreign state.

6. The Court has personal jurisdiction over Defendants because, following lengthy negotiations, Singh on behalf of himself and the other Defendants each entered into a binding Memorandum of Understanding ("MOU") with Plaintiff pursuant to which Defendants agreed, among other things, to deliver $9.5 million to Plaintiff in California in exchange for two convertible promissory notes and to purchase another $20 million in Plaintiff's Series E Preferred Stock in steps. Defendants agreed to invest in a California corporation. Defendants agreed that governing and interpretive law would be that of California. Defendants accepted the right to nominate themselves or others to the Board of Directors of Plaintiff of California corporation. Defendants agreed to submit any controversies arising from the MOU to arbitration in San Francisco, California. In making these agreements, Defendants were to serve as lead investors in Plaintiff's Series E preferred stock investment round. It is reasonable for them to face a lawsuit here because Defendants availed themselves of the laws of the State of California in matters from which this action arose and they consented to the Court's exercise of jurisdiction over them.

7. Moreover, Singh on behalf of GS Holding fulfilled the obligation of Defendants under the MOU to purchase convertible debt. He executed and delivered to BioQ's president two Convertible Promissory Bridge Note and Warrant Subscription Agreements. In doing so, Defendants agreed to pay an aggregate of $9.5 million to Plaintiff in California. Singh on behalf of Defendants specifically agreed to the "exclusive jurisdiction of the federal and state courts of the State of California and of the United States District Court for the Northern District of California that are located in San Francisco county, California, for the purpose of any suit, action or other proceeding arising out of or based upon . . ." said agreements.

8. At all relevant times, as alleged more fully herein, Singh and the other Defendants acted as an agent and alter-ego of each other, and in doing the things alleged herein acted within the course and scope of such agency. Each defendant's acts alleged herein was done with the permission and consent of the other Defendants.

9. At all times relevant hereto, on information and belief, Singh's family office including Star Capital and GS Holding were the alter egos of Singh. GS Holding shares Singh's initials. There exists and, at all times relevant to this action has existed, a unity of interest and ownership between Star Capital, GS Holding, and Singh such that any separateness between them has ceased to exist. Singh completely controlled, dominated, managed, and operated the other Defendants to suit his convenience by, among other things, making promises as alleged herein on their behalf, controlling the flow of money to and between such entities, controlling each of their respective contractual commitments, and moving and allocating assets between them in his sole discretion. Singh personally directed Defendants' activities towards California. Singh was the primary participant, guiding spirit, and central figure in the alleged wrongdoing on behalf of Defendants.

10. On information belief, at all times relevant hereto, Singh (i) controlled the business and affairs of GS Holding and Star Capital, including any and all of their affiliates; (ii) disregarded legal formalities and failed to maintain arm's length relationships among the corporate entities; (iii) inadequately capitalized GS Holding and Star Capital; (iv) used the same office and employed the same employees for all the corporate entities; (v) used the corporate entities as mere shells, instrumentalities or conduits for himself and/or his individual businesses; (vi) manipulated the assets and liabilities between GS Holding and Star Capital so as to concentrate the assets in one and the liabilities in another; (vii) used corporate entities to conceal their ownership, management and financial interests and/or personal business activities; and/or (viii) used the corporate entities Star Capital and GS Holding to shield against personal obligations, including but not limited to personal obligations to a former business partner and to Plaintiff as alleged herein.

**COMPLAINT & DEMAND FOR JURY TRIAL**

11. At all times relevant thereto, GS Holding and Star Capital were not only influenced and governed by Singh, but there was such a unity of interest and ownership that the individuality, or separateness, of Singh, Star Capital, and GS Holding ceased, and the facts are such that an adherence to the fiction of the separate existence of these entities would, under the particular circumstances, sanction a fraud or promote injustice.

### III.   BACKGROUND

12. Plaintiff is a specialty pharmaceutical company which does business throughout the world, including in the Middle East. It focuses on, among other things, infusible pharmaceutical products that are relatively easy to administer and are designed to reduce errors in medication dosage and delivery. Some of its most important markets are in the Middle East. On information and belief, the Middle East had a lot of capital available to companies, especially those companies with known business ties to the region.

13. In the second half of 2021, Plaintiff hired an investment banker to advise it with regard to securing financing in the form of convertible promissory notes and Series E Preferred Stock. The banker introduced Plaintiff's CEO, Joshua Kriesel ("Kriesel"), to Singh. On information and belief, the banker knew of Singh from at least one other situation where one or more entities related to Singh had successfully carried out investments in the banker's clients.

14. The banker specifically informed Kriesel that Defendants had funds to make whatever investment they agreed to make and at all times through May 2022, Kriesel in fact believed that Defendants would make the investment.

15. After significant work, expense, and negotiation, Star Capital and GS Holding entered into the MOU with Plaintiff on or around January 28, 2022.

16. Pursuant to the MOU, Defendants described some key terms of a series of private investments and a joint venture.

17. Defendants agreed in the MOU as a first step to purchase $9.5 million of convertible note instruments. Funding would occur no later than February 15, 2022. Funds were to be used for general working capital purposes. The notes would be convertible into Plaintiff's Series E Preferred Stock upon the closing of the investment round.

**COMPLAINT & DEMAND FOR JURY TRIAL**

18. As a second step, Defendants agreed to purchase $20 million of Plaintiff's Series E Preferred stock sufficient for them to own 27 percent of Plaintiff's voting shares. This investment could take the form of an additional convertible note offering. Like the funds from the purchase and sale of the convertible notes, funds were to be used among other things for general working capital purposes. Pursuant to the MOU, they would also be used by Plaintiff to purchase the rights to a pharmaceutical product by a third party and for pipeline development. Defendants agreed to use best commercial efforts to complete a first closing of Defendants' Series E Preferred Stock investment round by March 2022.

19. As a final step, Defendants agreed to establish a joint venture for certain manufacturing operations, which was to be funded with $5.1 million by Defendants.

20. In agreeing to the MOU, Defendants assumed a lead role in Plaintiff's Series E Preferred Stock investment round. Because Defendants entered into the MOU, Plaintiff's bankers changed their focus from looking for lead investors to bringing in follow on investors who would invest lesser amounts on the same terms. Follow on investment depended on Defendants' following through with their lead role in Plaintiff's Series E offering.

21. On February 15, 2022, in partial satisfaction of Defendants' obligations under the MOU, Singh signed and delivered to Plaintiff on behalf of all Defendants a Convertible Promissory Bridge Note and Warrant Agreement (the "First Note Agreement"). The First Note Agreement was an agreement to deliver $5 million to Plaintiff in exchange for a $5 million convertible note and a warrant to purchase 437,500 shares of Plaintiff's common stock.[1] The note would convert to Series E preferred stock on the closing of the investment round, which depended on Defendants' adherence to their commitments as set out in the binding MOU.

22. One week later, on February 22, 2022, Singh, on behalf of all Defendants, and Plaintiff signed a one-page document named "Side Agreement".

23. Pursuant to the Side Agreement, Defendants made specific promises to Plaintiff about when payments under the MOU and for the convertible notes would be made. GS

---

[1] While the First Note Agreement shows a date of December 30, 2021, no documents were exchanged until February 15, 2021.

**COMPLAINT & DEMAND FOR JURY TRIAL**

1  Holding, on behalf of both Defendants, agreed that payment under the First Note Agreement
2  would be made no later than the window between March 25, 2022 and March 31, 2022.

3      24. Defendants agreed that the second payment would be made no later than the
4  window between April 25, 2022 and April 30, 2022. The parties agreed that Defendants would
5  make the $20 million additional investment in two tranches of $10 million each. The first of the
6  two would be paid no later than the window between May 25, 2022 and May 30, 2022 and the
7  second of the two would be paid no later than the window between June 25, 2022 and June 30,
8  2022.

9      25. On or around April 18, 2022, after ignoring a few inquiries from Kriesel about
10 funding, Singh sent a WhatsApp message to Kriesel. He wrote in part:

> Hey bro I m so so sorry for not answering your messages it's a bad part from my side, sir first of all was too tied up in the audit in India I have multiple companies which we need to complete the audit before 31st of March, . N some of them have taken longer . . . so it's still on there . . . I will meet you on Wednesday afternoon say by 12:30-1pm.

16     26. As Singh requested, Kriesel, Plaintiff's investment banker, and Singh met in
17 Dubai on Wednesday, April 20, 2022 at around 12:30 p.m. Singh apologized about delays in
18 payment. He promised orally to Kriesel and Plaintiff's investment banker that Defendants had
19 made provision to fund the "first two tranches" of $9.5 million in approximately the next five
20 business days from GS Holding's Barclay's account in London and the remainder would be paid
21 in the next 45 days.

22     27. Singh then signed and delivered to Kriesel in person a second Convertible
23 Promissory Bridge Note and Warrant Agreement (the "Second Note Agreement"). The Second
24 Note Agreement was a promise to deliver $4.5 million to Plaintiff in exchange for a convertible
25 note and warrant to purchase 393,750 shares of Plaintiff's common stock at $4.00 per share.
26 Plaintiff signed and delivered to Defendants a $4.5 million convertible note and a warrant as
27 described above. The second note, like the first note, would convert to Series E preferred stock
28 upon the closing of the investment round.

**COMPLAINT & DEMAND FOR JURY TRIAL**
-6-

28. But Defendants failed to deliver the funds as promised. Through the late spring and summer of 2022, Kriesel sought assurances about the funding. Singh represented to Kriesel in a WhatsApp chat message on May 4, 2022 that payment would arrive no later than in a week. Later in the summer, Singh showed Kriesel a series of chat messages with Defendants' an individual that Defendant represented to be his financial advisor or investment banker regarding a $600,000,000 fund that would be set up by the first week of September 2022.

29. Notwithstanding Defendants' continued assurances, Defendants were unable or unwilling to fund the investment. Kriesel learned on June 21, 2022 in a meeting with Singh and his son, that Singh had been in a dispute with a business partner, which had been an important factor in Defendants' failure to fund the agreed investments. Singh told Kriesel in December 2022 that the dispute with his partner had started in March 2022. Plaintiff formally notified Defendants of their default in early January 2023.

## IV.   CAUSES OF ACTION
### FIRST CAUSE OF ACTION

**(Breach of Contract – binding MOU and Side Agreement – against All Defendants)**

30. Plaintiff repeats and re-alleges each of the allegations in the foregoing paragraphs of this Complaint as though they were fully set forth herein.

31. Defendants entered into the MOU and Side Agreement pursuant to which they agreed to purchase $29.5 million of convertible notes or stock, as well as fund $5.1 million toward a joint venture. Defendants agreed to use their best commercial efforts to complete a closing of Plaintiff's Series E Preferred Stock investment round in March 2022. Said agreements were binding and all material terms were set out with reasonable specificity.

32. Plaintiff performed all of its obligations pursuant to the relevant documents to the extent those obligations were not excused by Defendants.

33. Defendants breached the MOU and Side Agreement by inter alia failing to deliver the funds, as promised and failing to use their best commercial efforts to complete a first closing of Plaintiff's Series Preferred Stock investment round in March 2022.

34. Plaintiff was harmed, as it never received Defendants' promised investment funds. Defendants' refusal to pay Plaintiff as promised in the MOU and Side Agreement deprived Plaintiff of important operating funds, caused Plaintiff to give up looking for other lead investors during an important period, caused lost profits arising from a pharmaceutical product that Plaintiff would have introduced in the market, and it prevented Plaintiff from acquiring another company and its products. Plaintiff would have looked for other lead investors during a period when alternative funding was available in the Middle East and elsewhere. Were such investments not forthcoming, Plaintiff would have cut its operational expenses in early 2022.

35. Defendants' breach was a substantial factor in Plaintiff's harm.

36. At all times relevant to this action, Defendants were aware of and continue to be aware of the impacts Defendants' failure to deliver promised funds would have on Plaintiff and have acted or failed to act with knowledge of the harms caused by their breach of the MOU and Side Agreement.

WHEREFORE, Plaintiff prays for the relief set forth below.

### SECOND CAUSE OF ACTION

**(Breach of Contract – First & Second Note Agreements – against all Defendants)**

37. Plaintiff repeats and re-alleges each of the allegations in the foregoing paragraphs of this Complaint as though they were fully set forth herein.

38. On or around February 15, 2022, Singh, on behalf of all of Defendants, and Plaintiff entered into the First Note Agreement pursuant to which Defendants agreed to deliver $5,000,000 to Plaintiff in exchange for, among other things, Plaintiff's issuance of $5,000,000 convertible promissory note and a warrant.

39. Effective April 20, 2022, Singh, on behalf of all of Defendants, and Plaintiff entered into the Second Note Agreement pursuant to which Defendants agreed to deliver $4,500,000 to Plaintiff in exchange for, among other things, Plaintiff's issuance of $4,500,000 convertible promissory note and a warrant.

40. Plaintiff performed all of its obligations under the First Note Agreement and Second Note Agreement to the extent they were not waived by Defendants.

41. Defendants failed to deliver the funds, as promised.

42. Plaintiff was harmed in that Defendants failed to deliver promised funds. Plaintiff delivered an aggregate total of $9.5 million in convertible notes and warrants to purchase an aggregate of 831,250 shares of common stock to Defendants. Plaintiff was deprived of important operating funds as a direct result of Plaintiff's breach. Plaintiff would have cut its operating expenses had it known the truth. Plaintiff would have looked for funding elsewhere.

43. Defendants' breach was a substantial factor in Plaintiff's harm.

44. At all times relevant to this action, Defendants were aware of and continue to be aware of the impacts Defendants' failure to deliver promised funds would have on Plaintiff and acted with knowledge of the harms the failure would cause.

WHEREFORE, Plaintiff prays for the relief set forth below.

### THIRD CAUSE OF ACTION

### (Failure to Negotiate in Good Faith against all Defendants)

45. Plaintiff repeats and re-alleges each of the allegations in the foregoing paragraphs of this Complaint as though they were fully set forth herein.

46. This cause of action is pleaded in the alternative to the first cause of action. At all times relevant to this action, Defendants were under an obligation to negotiate the consummation of matters described in the MOU and Side Agreement in good faith.

47. Plaintiff negotiated in good faith as alleged herein. However, Defendants, and each of them, failed or refused to negotiate in good faith.

48. Plaintiff was harmed. It was deprived of important operating funds as a direct result of Plaintiff's breach. Plaintiff would have cut its operating expenses had it known the truth. Plaintiff incurred significant expenses during the negotiation and gave up other opportunities for funding as a direct result of Defendants' failure to negotiate in good faith.

49. Defendants' breach was a substantial factor in Plaintiff's harm.

WHEREFORE, Plaintiff prays for the relief set forth below.

//
//

**COMPLAINT & DEMAND FOR JURY TRIAL**

## FOURTH CAUSE OF ACTION

### (Promissory Fraud Against All Defendants)

50. Plaintiff repeats and re-alleges each of the allegations in the foregoing paragraphs of this Complaint as though they were fully set forth herein.

51. On or around April 20, 2022, Singh on behalf of Star Capital, GS Holding, and himself promised in writing to deliver $4.5 million to Plaintiff pursuant to the Second Note Agreement. Moreover, Singh promised orally to Kriesel and Plaintiff's investment banker in person in the middle of the day in Dubai on April 20, 2022 that Plaintiff would receive the payments as required in the First Note Agreement and Second Note Agreement within no later than approximately five business days.

52. Plaintiff is informed and believes and, on that basis alleges, that Defendants made the promises in the Second Note Agreement and the promise to pay $9.5 million within no later than approximately five business days recklessly and without regard for their true ability to honor them in order to induce action by Plaintiff. On information and belief, Singh's business dispute with his former business partner made it difficult, if not impossible, for Defendants to honor their promises. In fact, Kriesel learned from Singh in his meeting with Defendants on June 21, 2022 that Singh had been in a business dispute with his partner and that he was moving all of his funds to protect them from his partner. He additionally learned from Singh in December 2022 that such dispute had started in March 2022. On information and belief, in promising the quick delivery of $9.5 million from a Barclays account in the UK, Defendants acted recklessly by failing to appreciate the difficulties the partnership dispute would have on Defendants' ability to deliver funds as promised. On information and belief, such dispute prevented Defendants from timely making payments on their investments as promised because doing so was made difficult by the dispute or conflicted with Singh's efforts to shield his money from his former partner.

53. At the time alleged promises were made, Kriesel and Plaintiff were unaware of Defendants' dispute with Singh's former partner. Plaintiff relied on Singh's, Star Capital's and GS Holding's promises by, among other things, not looking for another lead investor, issuing

**COMPLAINT & DEMAND FOR JURY TRIAL**

-10-

1  convertible notes and warrants to Defendants, entering into agreements with vendors and
2  ordering delivery of goods.  Indeed, had Plaintiff known that it would not receive the promised
3  funding, it would have operated its business differently by among other things looking for
4  another lead investor, reducing variable expenses, not investing in a new business line and not
5  entering into one or more purchase orders that it entered into.

6     54.     Plaintiff in fact relied on Defendants' false promises and Plaintiff reliance on said
7  promises was reasonable.

8     55.     Defendants' false promises harmed Plaintiff by preventing it from obtaining
9  alternative investment during an important time.

10     56.     Defendants' breach of a substantial factor in Plaintiff's harm.

11  WHEREFORE, Plaintiff prays for the relief set forth below.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that a judgment be entered in its favor against Defendants as follows:

1. For specific performance of the agreements alleged herein through payment of an amount no less than $34,600,000 with interest thereon from March 1, 2022 according to proof;
2. For general damages for loss of alternative investment opportunities and loss of revenues and or profits and for costs and outlays that would not have otherwise been incurred in an amount no less than $75,000,000;
3. For punitive damages according to proof for Defendants' fraudulent and bad faith conduct, all of which was performed or ratified by Singh, a managing agent of the other two Defendants;
4. For attorney's fees pursuant to agreement;
5. For costs; and

//
//
//

**COMPLAINT & DEMAND FOR JURY TRIAL**
-11-

    6.    For such other and further relief as the Court deems just and proper.

DATED: January 26, 2023        CLAASSEN MARRS, P.C.

                                    /s/ John S. Claassen
By:_____
             John S. Claassen, Esq.
Attorney of Plaintiff
BIOQ PHARMA INCORPORATED

## REQUEST FOR JURY TRIAL

Plaintiff hereby requests trial by jury.

DATED: January 26, 2023                CLAASSEN MARRS, P.C.

                                    /s/ John S. Claassen
                            By:_____
                                    John S. Claassen, Esq.
                            Attorney of Plaintiff
                            BIOQ PHARMA INCORPORATED